# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **EDWARD SHAW, as Personal** | ) | |
| **Representative of the Estate of** | ) | |
| **ANANIAS SHAW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 16-0007-WS-M** |
| | ) | |
| **CITY OF SELMA, an Alabama Municipal** | ) | |
| **Corporation; CHIEF WILLIAM RILEY,** | ) | |
| **in his official and individual capacities; and** | ) | |
| **OFFICER DESMOND WILLIAMS, in his** | ) | |
| **Official and individual capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter comes before the Court on defendants' Motion for Summary Judgment (doc. 13). The Motion has been extensively briefed and is ripe for disposition. Also pending is defendants' Motion to Strike Affidavit of Faya Rose Toure (doc. 23), as to which plaintiff did not respond within the time allotted by Civil L.R. 7(c).

## I.   Nature of the Case.

On the afternoon of December 4, 2013, City of Selma Police Officer Desmond Williams shot and killed Ananias Shaw, a 74-year old male wielding a hatchet, as he stood outside a residence in Selma, Alabama. Edward Shaw, acting in the capacity of personal representative for Shaw's estate,[1] subsequently filed a Complaint in the Circuit Court of Dallas County, Alabama on December 4, 2015, against defendants City of Selma, Chief William Riley, and Officer Desmond Williams.[2] On January 6, 2016, defendants removed the case to this District

---

[1]     The record reflects that Edward Shaw is the brother of the decedent, Ananias Shaw. (E. Shaw Dep. (doc. 13, Exh. 14), at 24.)

[2]     In its original configuration, the Complaint also purported to name fictitious defendants identified as "Officers X and Y and Defendant Z in their individual and official (Continued)

Court, with federal subject matter jurisdiction properly being invoked pursuant to the federal question provisions 28 U.S.C. § 1331, inasmuch as the face of the Complaint identifies a federal constitutional claim.[3]

------------------------------

capacities as police officials of the City of Selma, who are otherwise unknown but are those that unlawfully contributed to the death of Ananias Shaw and violated his rights." (Doc. 1, Exh. A, at 1.) By Order (doc. 9) dated March 2, 2016, Magistrate Judge Milling ordered those references to fictitious defendants stricken on the ground that fictitious party pleading is not generally recognized in federal court. This is a correct application of federal procedure. *See, e.g.,* *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) ("As a general matter, fictitious-party pleading is not permitted in federal court."); *Kirksey v. Schindler Elevator Corp.*, 2016 WL 3189242, *1 n.3 (S.D. Ala. June 7, 2016) ("Fictitious-party pleading is generally not permitted in federal court, absent certain circumstances that are not present here.") (citations omitted). At any rate, plaintiff at no time sought to amend the Complaint to name any additional defendants, and the deadline for doing so has long since expired. As such, the only defendants in this matter are City of Selma, Chief Riley, and Officer Williams.

[3]      To be sure, defendants predicated their Notice of Removal on the civil rights provisions of 28 U.S.C. § 1443. (Doc. 1, ¶ 8.) That section is demonstrably inapplicable here. To remove a civil action under § 1443(1), a petitioner must show (i) "that the right upon which the petitioner relies arises under a federal law providing for specific civil rights stated in terms of racial equality," and (ii) "that he has been denied or cannot enforce that right in the state courts." *Marcus v. Galvez*, 522 Fed.Appx. 878, 880 (11th Cir. July 5, 2013) (citations and internal quotation marks omitted). No such showing has been or can be made in this case. And § 1443(2) applies "only to acts by federal officers or agents and those authorized to act for them." *Id.* (citation omitted). There is no suggestion in the record that the Selma police officers involved in this matter were federal officers or agents, or had been authorized to act for them. Thus, removal under § 1443 was improper. Nonetheless, the Notice of Removal correctly observes that "Plaintiff's Complaint alleges causes of action presenting a federal question." (Doc. 1, ¶ 2.) The vast majority of the 22-count Complaint cites no federal statute or constitutional provision, instead trading in generic references such as "rights to due process," "rights to be free from unreasonable searches and seizures," and the "right to be free from cruel and unusual punishment." Of course, those rights are guaranteed by both the U.S. Constitution and the Alabama Constitution; therefore, such references do not necessarily raise a federal question. However, in Count 3 of the Complaint, plaintiff alleged that "defendant Officers seized the Decedent under color of state law" in a manner that "violated the plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures." (Doc. 1-1, at ¶¶ 26-27.) Even though the Complaint does not expressly cite 42 U.S.C. § 1983 or specify that the U.S. Constitution forms the basis for any claim presented or right allegedly violated, the Complaint's reference to a "Fourth Amendment" search and seizure violation in Count 3 can be nothing other than a federal constitutional claim pursuant to § 1983. (The Alabama Constitution sets forth the right to be free from unreasonable search and seizure in Section 5.) That cause of action presents a federal question, which properly supported removal under 28 U.S.C. § 1441(c)(1)(A).

The Complaint purports to assert no fewer than 22 causes of action against defendants, sounding in theories of wrongful death, unreasonable use of force, false arrest (Fourth Amendment violation), false imprisonment (pleaded twice), policy of inadequate training and supervision, custom of police abuse (pleaded twice), custom of deliberate indifference relating to hiring, deliberate indifference to repeated complaints (pleaded twice), civil conspiracy (pleaded twice), assault and battery, false arrest (without mention of Fourth Amendment), invasion of privacy, negligence, wantonness, negligent/careless/unskillful hiring, negligent/careless/ unskillful training or supervision, tort of outrage, and violation of Article 1, Section 1 of the Alabama Constitution.  (*See* doc. 1-1.)

Defendants now move for summary judgment on all claims and causes of action interposed in the Complaint against all defendants.

## II.     The Motion to Strike.

Antecedent to addressing the Motion for Summary Judgment, the Court pauses to consider defendants' Motion to Strike (doc. 23).  As part of his summary judgment response, plaintiff submitted the "Affidavit of Faya Rose Toure" (doc. 21, Exh. 7), who was plaintiff's co-counsel of record from March 2, 2016 (when she filed a Notice of Appearance (doc. 8)) until she was granted leave to withdraw on February 3, 2017.  (*See* docs. 19, 20.)

In her Affidavit, Toure touts her membership in an organization known as the "Due Process Committee," which "investigates complaints of due process violations and suspected inequities in the criminal justice system in Selma, Alabama."  (Toure Aff., at 1.)[4]  Toure explains

---

[4]     Although plaintiff submitted more than 300 pages of exhibits in support of his summary judgment memorandum, he failed to comply with the directive in both the Local Rules and the Rule 16(b) Scheduling Order requiring that he furnish the Court with courtesy hard copies of those exhibits to facilitate the summary judgment review process.  *See* Civil L.R. 7(g) ("If a party's exhibits in support of, or in opposition to, a motion exceed fifty (50) pages in the aggregate, that party must submit a courtesy copy to chambers."); doc. 9, ¶ 14(c) ("If a party's exhibits in support of or in opposition to a motion exceed 50 pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to the Judge's chambers by mail or hand delivery.").  Also, the Court observes that plaintiff's exhibits include complete copies of multiple deposition transcripts, in derogation of the requirement that only relevant excerpts be filed.  *See* Civil L.R. 5(a).  Notwithstanding plaintiff's noncompliance with these requirements, and the attendant burden placed on the Court, the undersigned has taken the summary judgment motion under submission as-is in the interest of not delaying its adjudication, despite the current overinclusive form of the exhibits and the missing courtesy copies.

that this committee "led the campaign to release the video" of the Shaw shooting, and indicates that the Selma Police Department ultimately acquiesced "[b]ecause of our intervention." (*Id.*) Toure then states that she "talked to several witnesses, including Sernica Walker and other employees at Church's Chicken restaurant and Betty Ford, who actually witnessed the shooting." (*Id.*) Toure relates that unidentified Church's employees told her that Shaw "was a regular customer" at the restaurant, that he "was not violent" and that he "did not have a hatchet at Church's" on the day in question. (*Id.* at 2.) Toure goes on to write that a witness named Betty Ford told her that Shaw did not raise the hatchet or attempt to do the officers harm. (*Id.*) Toure then avers that she has experience in "addressing violent suspects with mental or emotional problems," that the Selma Police Department has requested her assistance with such matters previously, and that they never called her in the Shaw matter even though she was "available to help." (*Id.*) Finally, Toure indicates that District Attorney Michael Jackson told the Due Process Committee that he was unaware of Betty Ford's observations in witnessing the shooting, and that Ford was not called to testify before the grand jury. (*Id.*)

The Court agrees with defendants that the Toure Affidavit suffers from several significant defects that necessitate its deletion from the summary judgment record. As an initial matter, it is uncontroverted that plaintiff never disclosed Toure as a witness, whether in his initial disclosures pursuant to Rule 26(a)(1)(A), in discovery responses, or in supplemental disclosures pursuant to Rule 26(e). Of course, Rule 26(a) mandates disclosure of "the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Rule 26(a)(1)(A)(i), Fed.R.Civ.P. The Rule 16(b) Scheduling Order unambiguously directed that "[t]he initial disclosures required by Fed.R.Civ.P. 26(a)(1) are **ORDERED** to be made by the parties not later than **March 16, 2016**." (Doc. 9, ¶ 4.) Yet plaintiff did not disclose Toure at that time. Similarly, Rule 26(e) calls for supplementation of Rule 26(a) disclosures "in a timely manner if the party learns that in some material respect the disclosure … is incomplete … and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Rule 26(e)(1)(A), Fed.R.Civ.P. Yet plaintiff never supplemented his Rule 26(a) disclosures to list Toure.

By all appearances, the first notice defendants received that Toure is or might be a witness for plaintiff was the receipt of her summary judgment affidavit on February 3, 2017. That is simply too late.  Under the circumstances, the Court concludes that plaintiff failed timely to disclose Toure as a witness.  That omission implicates Rule 37(c)(1), which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, … unless the failure was substantially justified or is harmless."  Rule 37(c)(1), Fed.R.Civ.P.  Plaintiff has made no argument and no showing that his failure to identify Toure in a timely manner was substantially justified or harmless.  Accordingly, the Court finds that striking the Toure Affidavit is an appropriate sanction pursuant to Rule 37(c)(1).[5]

Even if plaintiff's nondisclosure of Toure as a witness did not warrant striking her affidavit pursuant to Rule 37(c)(1) (which it does), defendants' Motion to Strike would be properly granted for two independent reasons.  First, insofar as Toure's Affidavit merely parrots back what Toure says witnesses told her, such testimony does not appear capable of being presented in admissible form at trial.  *See, e.g., Johnson v. Mobile Infirmary Medical Center*, 2015 WL 1538774, *1 (S.D. Ala. Apr. 7, 2015) ("It is well settled that exhibits are properly considered for summary judgment purposes as long as they may be reduced to admissible form at trial."); Rule 56(c)(2), Fed.R.Civ.P. ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").  The summary judgment record is devoid of any ground for concluding that plaintiff could present this evidence in admissible form at trial.  Certainly, it would be impermissible hearsay for plaintiff to call Toure to the stand to testify to what other people told her as substantive evidence of what actually happened that day.  Nor could plaintiff call certain of these witnesses (Sernica Walker

---

[5]       This conclusion applies with particular force to those aspects of the Toure Affidavit wherein she purports to be a fact witness, such as where Toure states that she had a relationship with the City of Selma Police Department pursuant to which she would be called to assist with violent suspects with mental or emotional problems, but no such call was made in this case despite her availability.  Thus, plaintiff would have Toure testify that defendants had other available avenues for defusing the Shaw confrontation, yet they declined to pursue them.  This kind of testimony (as contrasted with Toure's mere reporting of her own investigation, presumably in her role as plaintiff's former co-counsel, of what other witnesses told her) unquestionably activates disclosure obligations that plaintiff did not satisfy, thereby prejudicing defendants in obvious ways and mandating exclusion pursuant to Rule 37(c)(1).

and other unnamed employees at Church's Chicken) to testify about their observations at trial, because plaintiff never disclosed Walker or those other individuals as witnesses, pursuant to Rules 26(a)(1) and 26(e).  Finally, plaintiff could not call Toure in his case-in-chief to reiterate the words of Betty Ford (who is listed as a plaintiff's witness and whose video interview has been separately filed as plaintiff's Exhibit 8).  Such testimony must come in, if at all, through Ford herself.

A second independent reason for striking the Toure Affidavit is that it includes substantial information that is irrelevant to the issues joined in this case for trial.  For example, Toure's role in the Due Process Committee, that Committee's activities, and the Committee's discussions with the District Attorney concerning facts and testimony that were or were not known to the grand jury are simply not relevant to the claims and issues joined in the Complaint.

For all of these reasons, the Motion to Strike (doc. 23) is **granted**.  The Affidavit of Faya Rose Toure (doc. 21, Exh. 7) is **stricken** from the record, and will not be considered or weighed in any manner in the adjudication of defendants' Motion for Summary Judgment.

## III.   Background Facts.[6]

### A.   *Circumstances Leading to the Dispatch Call.*

Shortly after 2:00 p.m. on December 4, 2013, Aninias Shaw attempted to enter the Church's Chicken restaurant on Broad Street in Selma, Alabama.  Shaw was known to the restaurant staff as a longtime customer who "had came in there other times and cursed us out and stuff."  (Lindsey Dep. (doc. 13, Exh. 6), at 5-6, 8.)  To the restaurant's general manager, Ricky

---

[6]        The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment. … Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor.  Also, federal courts cannot weigh credibility at the summary judgment stage.  *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor.  *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

Austin, Shaw was known as a customer who had caused problems necessitating police intervention in the recent past. (Austin Dep. (doc. 13, Exh. 7), at 5-6, 11.)[7] Most notably, just days before the incident in question, Shaw had entered the crowded lobby of the Church's Chicken restaurant brandishing a pocketknife with its blade extended, and had proceeded to "poke at" customers with the knife. (Lindsey Dep., at 7-8.) A Church's employee who witnessed Shaw's behavior called the police. (*Id.*) Three officers arrived within minutes, prompting Shaw to leave the premises after a brief confrontation in which Shaw "poked at" an officer with his pocketknife, and the officer responded by placing his hand on his service weapon. (*Id.* at 9-10.)

Back to the afternoon of December 4, Austin observed Shaw approaching the entrance of the Church's Chicken restaurant armed with a hatchet. (Austin Dep., at 6.) Austin reached the door first, and told Shaw, "[N]o, you cannot come in." (*Id.*)[8] In response, Shaw "got kind of name calling," but eventually walked away when Church's staff once again called the police. (*Id.*) At 2:19 p.m., a Dallas County dispatcher directed Selma police officers to the scene with the call "disorderly conduct in progress." (Doc. 13, Exh. 12.)

**B.      The Shooting.**

One recipient of the dispatch was City of Selma Police Officer Desmond Williams, who was driving his patrol car approximately two minutes away from the Church's Chicken restaurant. (Williams Dep. (doc. 13, Exh. 2), at 10-11.) Officer Williams had been hired by the Selma Police Department in August 2009, and had completed a 480-hour course at the Alabama Criminal Justice Training Center in November 2009. (Doc. 13, Exh. 11.) He had also completed numerous continuing education courses on topics such as use of force, interviewing individuals with mental illnesses, search and seizure, and firearm safety. (*Id.*) Upon receiving the dispatch, Officer Williams was contacted via radio by Detective Ronald Jones, who was completing a

---

[7]      In Austin's words, he "had problems with [Shaw] in the past, which we've had to call the police because he would come in and make a scene in the restaurant." (*Id.* at 9.)

[8]      Austin's deposition testimony is pellucidly clear that the reason he barred Shaw from entering the restaurant was "because he had that hatchet in his hand." (Austin Dep., at 6.) Austin explained that he considered Shaw to be a danger because of his hostile demeanor, his past behavior, and "you know, he coming in with a hatchet, you never know who he could swing at and hit somebody." (*Id.* at 10.)

traffic stop in that area and had spotted Shaw in an alley near the Church's Chicken hollering and screaming to himself.  (Jones Dep. (doc. 13, Exh. 4), at 6, 10.)  Detective Jones believed that Shaw had gone into an abandoned laundromat building at the corner of Griffin and Washington, and could hear a person who he thought was Shaw being loud and "raising Cain" inside that building.  (*Id.* at 18.)  Detective Jones notified Officer Williams by radio that Shaw was in that abandoned laundromat.  (Williams Dep., at 11.)  Altogether, three Selma Police officers (the third being Officer Daniel Boone) responded to the call and arrived at the laundromat almost contemporaneously.

Officer Boone was familiar with Shaw, having dealt with him several times and having arrested him for public intoxication and disorderly conduct in the past.  (Boone Dep. (doc. 13, Exh. 13), at 11-12.)  When all three officers had arrived and exited their vehicles, Officer Boone went inside the abandoned building alone "to try to talk to Mr. Shaw and get him out" so that the officers "can talk and see what's going on," particularly given that there had been multiple instances of Shaw being disorderly at Church's Chicken.  (*Id.* at 11, 14, 16.)  Officer Boone asked Shaw to come out and talk.  (*Id.* at 18.)  In response, Shaw bent down and picked up a hatchet.  (*Id.*)  Officer Boone felt threatened, reasoning, "Mr. Shaw had a hatchet in his hand and posed a threat to me.  If I would have let him leave, he would have posed a threat to the community as well."  (*Id.* at 19.)  When he saw Shaw pick up the hatchet and begin walking towards him, Officer Boone immediately drew his weapon and backed out of the building.  (*Id.* at 25, 27.)  Both Officer Boone and Shaw, still wielding the hatchet, exited the building, coming outside to where Detective Jones and Officer Williams were.[9]

The tragic events unfolding over the next two-plus minutes are the essence of this lawsuit.  They are also captured to a large degree on the recording taken from Officer Williams' body camera and microphone, found in the record as Defendants' Exhibit 9.  (*See* doc. 13, Exh.

---

[9]     The long-handled, bladed weapon that Shaw was carrying is referred to at various times in the summary judgment record as an "axe" or a "hatchet."  It is depicted in a photograph marked as Defendant's Exhibit 10.  (Doc. 13, Exh. 10.)  Officer Williams testified that it was approximately 12 to 18 inches long.  (Williams Dep., at 19.)  Plaintiff's summary judgment filing repeatedly characterizes the hatchet as "small" and having a "small" blade; however, they identify no testimony to that effect.  At any rate, it is abundantly clear from the photograph that the hatchet in question was not a toy and not an implement to be trifled with.  It was obviously a deadly weapon, capable of inflicting severe bodily harm or death.

9.)  The audio-video recording at Exhibit 9 is accepted as true for summary judgment purposes, notwithstanding any contrary evidence in the record; provided, however, that other evidence may be considered insofar as it fleshes out events as to which the video is unclear or ambiguous.[10] Review of Exhibit 9 establishes the following:  The video begins with Officer Williams in his patrol vehicle, stating that he is en route to the area of Church's Chicken in reference to a subject that is disorderly, whose whereabouts are now near Washington Street and Griffin Avenue.  A voice over the radio says, "He is inside the building," or words to that effect.  At approximately the 1:05 mark of the video,[11] Officer Williams parks his car, exits and walks over to a dilapidated building reading "Towns Laundramat [*sic*]."  Two other officers (Detective Jones and Officer Boone) are seen bending down and peering inside through a darkened opening at ground level. At the 1:40 mark, one of the officers (Officer Boone) goes inside through the opening, as the other officer (Detective Jones) says, "He'll fight you in a minute."

At the 1:50 mark, Detective Jones says, "You see his shoes right there?" and Officer Williams (who is now bending down to peer into the opening) answers affirmatively, with both officers chuckling.  Officer Boone can be heard inside telling Shaw, "I just want to talk to you." Moments later, at the 1:57 mark, Officer Boone is heard (still inside the building) saying firmly

---

[10]     Facts clearly depicted in a video recording whose authenticity has not been challenged are accepted for summary judgment purposes, even where they conflict with the plaintiff's narrative.  *See, e.g., Scott v. Harris*, 550 U.S. 372, 380-81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible"); *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) ("Where the video obviously contradicts Plaintiff's version of the facts, we accept the video's depiction instead of Plaintiff's account."); *Davidson v. City of Opelika*, --- Fed.Appx. ----, 2017 WL 164315, *2 (11th Cir. Jan. 17, 2017) ("when there is a reliable video recording of disputed events, we are to view facts in the light depicted by the video") (citation and internal marks omitted).  No question having been raised as to its authenticity or integrity, Officer Williams' body-camera video is accepted as true and accurate for summary judgment purposes.

[11]     The lower-right corner of the video includes a date/time stamp in red numerals; however, for purposes of this narrative, and to demonstrate clearly the total elapsed time in the incident, the referenced times herein relate to the running time of Exhibit 9 as reflected on the video player, rather than the red numerals stamped on the video itself.

and clearly, "Put the axe down."  Officer Williams loudly repeats the command, "Put the axe down," approximately five times over the next 10 seconds, by which time Shaw has emerged from the building, still carrying the axe, and is now close by the other officers.  At the 2:12 mark, Officer Williams, still loudly and forcefully saying "put the axe down" over and over again, draws his service firearm and points it at Shaw with both hands.  Shaw appears on the screen at around 2:14, and commences walking away from the building, cursing and yelling as he does so, and saying, "I ain't putting a goddamned thing down."  As Officer Williams and the other officers repeat the command to put the axe down, Shaw responds, "F*** you, n*****" and says "I ain't putting shit down."  He then turns and starts walking down the street at the 2:20 mark. Officer Williams continues to point his firearm at Shaw, and one of the other officers is seen holding a long stick (an ASP, or police expandable baton).[12]  Officer Williams says, "go in the house, go go go go go," apparently directed at nearby members of the public who are not visible on the video.  By the 2:40 mark, Shaw is walking west on Griffin Avenue – in the direction of the Church's Chicken, which was less than a block away – with all three officers walking along with him, still commanding him to put the axe down as Shaw yells back at them, mostly incoherently.  Officer Williams calls in on his radio, "Be advised the subject is armed with an axe."  One of the other officers is heard saying, "Mr. Shaw, put the axe down.  We won't hit you, man."

By the 3:00 mark, Shaw is walking through what appears to be a residential or mixed-use area.  Several people can be seen standing outside a house a short distance from where Shaw is. The officers continue to command Shaw to put the axe down and reassure him "we want to talk to you."  However, Shaw keeps walking away, still grasping the weapon in his right hand.  At the 3:10 mark, Shaw has slowed down and almost stopped walking.  Following from a close distance, Officer Williams raises his firearm with both hands and again commands him to put the axe down.  Beginning at the 3:20 mark, the situation escalates at lightning speed.  Shaw steps off

---

[12]    Officer Boone testified that he intended to attempt to disarm Shaw with his ASP and that he told Officer Williams as much.  (Boone Dep., at 38.)  According to Officer Boone, Shaw overheard this comment and responded, "Try it and I'll hack you."  (*Id.* at 39.)  Officer Boone did not ultimately attempt to disarm Shaw with his ASP, and explained that he refrained from doing so because "if I would have got in close proximity of him, he could have hacked me."  (*Id.* at 43.)

the street and into a grassy strip in front of a house (where several people are seen sitting on a porch), wheels and yells at the officers.  At 3:23, Shaw turns to face Officer Williams, then shouts, "Shoot it! Shoot it!"  Officer Williams responds, "I will pop you," as Shaw faces him from just a few feet away.  At 3:25, Shaw moves suddenly toward Officer Williams; however, Shaw's right arm and the exact position of the axe are out of the frame.  At 3:26, Shaw – still moving toward, and by this time less than five feet away from, Officer Williams – yells, "Shoot it!" again.  His right arm and the axe remain outside the frame.  Immediately (and still at the 3:26 mark), Officer Williams fires a single gunshot at Shaw's chest from very close range.  Shaw falls to the ground.[13]  From the moment Shaw picks up the hatchet inside the laundromat until the fatal shot is fired 90 seconds later, the officers command him to "put the axe down" at least 28 times that can be heard on video.[14]  Paramedics arrived, and Shaw was pronounced dead at the scene.  (Doc. 13, Exh. 1, at 3.)

In his deposition, Officer Williams explained that Shaw "was a threat to myself and to the other people around us. … His intentions were to hurt myself and possibly other people around us." (Williams Dep., at 34.)  When asked why he shot Shaw when he did, Officer Williams answered, "When he raised his axe and came towards me with it. … It was raised above his head and come towards me."  (*Id.* at 36.)  Similarly, Detective Jones testified that Shaw "goes directly at Williams."  (Jones Dep., at 47.)  Detective Jones elaborated that Shaw "raised the hatchet above his head … [a]nd charged," taking two or three steps toward Officer Williams before the shot was fired.  (*Id.* at 57-58.)  Officer Boone's testimony was that "Mr. Shaw crossed a little ditch and then turned around at Officer Williams and began to raise his axe, and Officer Williams fired one shot."  (Boone Dep., at 41.) Witness Donald Jones similarly testified that

---

[13]     The video remains running for more than 25 minutes after the shooting takes place.  Officer Williams appears dazed and breathing heavily, and is heard to tell several other officers in the immediate aftermath, "He came after me with the axe, man."  Officer Williams testified that he had never killed anyone before and he had never shot anyone before.  (Williams Dep., at 42.)

[14]     Officer Boone testified that the officers instructed Shaw to drop the hatchet "30 plus times" in total.  (Boone Dep., at 58.)

Shaw raised the hatchet before Officer Williams shot him.  (D. Jones Dep. (doc. 13, Exh. 5, at 8-9.)[15]

## IV.   Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).

---

[15]      Plaintiff disputes all of these witnesses' testimony that Shaw raised the hatchet at the time of the shooting.  The only evidence he cites in support of his position is Exhibit 8, which is an untranscribed video interview that an unidentified Selma Police investigator took of Betty Ford and Kizzy Ford (Betty's daughter-in-law) at 1:45 p.m. on December 6, 2013.  Betty and Kizzy Ford were on the porch of the house in front of which the shooting occurred.  The Court has watched the entire 18-minute video of the Ford interviews.  As an initial matter, the Fords' testimony contradicts clear video evidence of the incident in multiple significant ways (*i.e.*, the Fords indicated that Shaw did not say anything to the officers other than to leave him alone, that Shaw did not charge or come toward Officer Williams, etc., when the video recording unmistakably shows otherwise).  As discussed *supra*, plaintiff cannot create a material issue of fact simply by trying to contradict clear video evidence of the incident.  More fundamentally, plaintiff offers no explanation for why he believes Exhibit 8 is admissible, or how it might be presented in admissible form at trial.  The Fords were not placed under oath at any time before or during the interview.  The Fords' depositions were apparently never taken in this case.  Plaintiff does not explain why he is endeavoring to introduce the Fords' version of events in this manner, rather than via deposition or affidavit.  Assuming plaintiff could overcome these hurdles, Betty Ford and Kizzy Ford each stated during their joint interview with an unnamed Selma Police investigator that Shaw did not raise the hatchet at all before Officer Williams fired the fatal shot.

"Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## V.    Analysis.

### A.    Fourth Amendment Excessive Force Cause of Action.

In Count 2 of the Complaint, plaintiff asserts a § 1983 claim for excessive force, alleging that Officer Williams violated Shaw's Fourth Amendment right to be free from unreasonable searches and seizures.  On summary judgment, Officer Williams invokes the doctrine of qualified immunity, which "offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (citation and internal quotation marks omitted).  "In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. … Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations and internal quotation marks omitted).  In evaluating whether a plaintiff has met that burden, "[t]he threshold inquiry … is whether [the] plaintiff's allegations, if true, establish a constitutional violation."  *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (citation omitted).[16]

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).  Thus, the critical question for evaluating whether a particular application of force is excessive for Fourth Amendment purposes is whether it was objectively reasonable.  *See,*

---

[16]    There is not, and cannot reasonably be, any dispute that Officer Williams was engaged in a discretionary capacity at the time of the shooting.  *See generally Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005) ("Because the defendants were trying to apprehend a potentially suicidal subject, they were clearly engaged in a discretionary capacity."); *Landsman v. City of Vero Beach*, 621 Fed.Appx. 559, 562 (11th Cir. July 10, 2015) ("Because McClellan was engaged in the apprehension of a possibly intoxicated subject, he was clearly engaged in a discretionary capacity.") (citation and internal quotation marks omitted).  Plaintiff does not suggest otherwise.

*e.g., Smith v. LePage*, 834 F.3d 1285, 1294 (11ᵗʰ Cir. 2016) ("The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and the inquiry is an objective one.") (citation and internal quotation marks omitted).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11ᵗʰ Cir. 2013) (citation omitted).  In performing this balancing exercise, courts must carefully scrutinize the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citation omitted).  Recently, the Eleventh Circuit concluded that, even when the first and third factors are absent, the presence of the second factor – whether the suspect poses an immediate threat – may justify entry of summary judgment for the officer on an excessive force claim.  *See Davidson v. City of Opelika*, --- Fed.Appx. ----, 2017 WL 164315, *3-4 (11ᵗʰ Cir. Jan. 17, 2017) (where reasonable officer would have believed that suspect was pointing a gun at him, suspect objectively posed a grave and immediate threat that rendered the use of deadly force not excessive).  Simply put, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, use of deadly force does not violate the Constitution."  *Penley v. Eslinger*, 605 F.3d 843, 851 (11ᵗʰ Cir. 2010) (citation and internal quotation marks omitted).  "[T]he second factor can be reduced to a single question: whether, given the circumstances, the suspect would have appeared to reasonable police officers to have been gravely dangerous."  *Id.* (citation and internal quotation marks omitted).

The uncontested summary judgment record establishes that, at the moment Officer Williams fired the fatal gunshot, Shaw would have appeared to reasonable police officers to be gravely dangerous.  Shaw was holding a deadly weapon – the hatchet – in his right hand.  He had refused to comply with literally dozens of pointed, direct commands by law enforcement officers during the previous 90 seconds to relinquish that deadly weapon.  He had displayed open hostility and erratic behavior, including a stream of profanity and often incoherent invective directed at Officer Williams and his colleagues.  At the decisive moment, Shaw abruptly stopped walking away from Officer Williams, wheeled around to face him, screamed "shoot it! shoot it!" and either charged or lunged toward Officer Williams, still holding the hatchet in his right hand

at a distance of no more than a couple of feet away from the officer.  Both Officer Williams and numerous other witnesses testified that Shaw was raising the hatchet as he did so, as if preparing to strike Officer Williams.[17]  In that moment, Shaw's aggressive and unpredictable behavior while armed with a deadly weapon rendered him gravely dangerous to any reasonable observer.  In that moment, a reasonable officer would have believed that Shaw posed a grave and immediate threat to Officer Williams' safety.  In that moment, Officer Williams' use of deadly force against Shaw did not violate the Fourth Amendment.  *See, e.g., Martinez v. City of Pembroke Pines*, 648 Fed.Appx. 888, 893-94 (11th Cir. Apr. 21, 2016) (officer's use of deadly force was in compliance with Fourth Amendment where the suspect was unresponsive to commands and, with loose handcuffs swinging from his wrist as a weapon, suddenly advanced to within a few feet of the officer).[18]  "This is exactly the type of tense, uncertain and rapidly

---

[17]     The Court understands, of course, that the video does not depict what Shaw's right hand was doing at the crucial moment.  The Court further understands that Betty and Kizzy Ford gave an unsworn interview to a Selma police investigator in which they both contradicted the clear video evidence in several key respects, and also indicated that Shaw never raised the hatchet.  To the extent that the Fords contradict the video, their statements are properly discredited for summary judgment purposes.  There are also important threshold admissibility concerns, as discussed *supra*.  Nonetheless, assuming plaintiff could establish the admissibility of the Fords' unsworn interview statements and create an issue of fact as to whether Shaw was actually raising the hatchet or not when Officer Williams opened fire, such a factual dispute would not be material for summary judgment purposes.  The law does not, after all, "require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."  *Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) (citation omitted); *see also Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("Regardless of whether Jean-Baptiste had drawn his gun, Jean-Baptiste's gun was available for ready use, and Gutierrez was not required to wait and hope for the best" before using deadly force to stop him) (citation and internal marks omitted); *Garczynski v. Bradshaw*, 573 F3d 1158, 1169 (11th Cir. 2009) ("Garczynski repeatedly disobeyed the officers' orders, first to show his hands and then to drop his gun.  These factors, even assuming that Garczynski never pointed the gun at the officers, provided a sufficient basis for the officers reasonably to believe that Garczynski posed an immediate risk of serious harm to them.").  Thus, Officer Williams was under no obligation to wait to see if Shaw attempted to bring the hatchet down on his skull before deploying deadly force to protect himself.

[18]     *See also Singletary*, 804 F.3d at 1184 ("evidence demonstrates that Lechner's car began accelerating toward Defendant as he stood in front of it and that his use of deadly force to stop what appeared to be an imminent threat to his life was not excessive"); *Garczynski* 573 F.3d at 1168 ("[T]he escalation into deadly force was justified by Garczynski's refusal to comply with the officers' commands.  After identifying themselves, the officers repeatedly ordered (Continued)

evolving crisis envisioned by the Supreme Court." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1168 (11th Cir. 2009) (citation and internal quotation marks omitted).

In so concluding, the Court has considered multiple counterarguments raised by plaintiff. First, plaintiff presents a series of arguments second-guessing the police officers' decisions to confront Shaw in the abandoned laundromat, to follow him down the street, and to point a firearm at him. Those contentions are rejected for the reasons set forth *infra*, in the context of plaintiff's false arrest / false imprisonment claims.[19] Second, plaintiff contends that "[m]ost importantly, the decedent was without fault in the encounter." (Doc. 21, at 11.) This assertion cannot be reconciled with the clear summary judgment record; indeed, the video unambiguously establishes that Shaw refused more than two dozen lawful commands by Selma police officers to "put down the axe," that he cursed and yelled at the officers, that he behaved in a hostile and erratic manner, and that in the three seconds preceding the fatal shot, Shaw charged or lunged at Officer Williams yelling "shoot it! shoot it!" while Shaw was still holding a deadly weapon in his right hand. Given these uncontroverted record facts, plaintiff's portrayal of Shaw as being "without fault in the encounter" is simply counterfactual.[20] Third, plaintiff's arguments that

_____

Garczynski to show his hands. … The officers reasonably reacted to what they perceived as an immediate threat of serious harm to themselves."); *Lenning v. Brantley County, Ga.*, 579 Fed.Appx. 727, 732 (11th Cir. Aug. 28, 2014) ("Jones's use of deadly force in response to Lenning's aggressive and life-threatening conduct was objectively reasonable.").

[19]     They also fail for the additional reason that in evaluating whether Officer Williams used excessive force in shooting Shaw in the chest, the relevant time frame is that immediately proceeding the shooting. Whether the officers should have elected either (i) to leave Shaw in the abandoned laundromat or (ii) to leave him to walk alone toward Church's Chicken with his hatchet in a raving, hostile state and cross their fingers that he did not hurt anybody is not relevant to the reasonableness analysis for Officer Williams' decision to fire at Shaw at the precise moment he did.

[20]     In framing his argument in this manner, plaintiff relies on a selective reading of cherry-picked excerpts from the Deposition of Don Jones. (Doc. 21, at 12.) Yet the same witness testified that, at the time of the shooting, Shaw "raised [the hatchet] high enough to, you know, just hold it back like this inside his hands. … Well, he just had it halfway like this in his hand like he was fixing to throw it or something." (D. Jones Dep., at 9.) Plaintiff inexplicably omits this testimony – which obviously supports the officer's use of deadly force – from his factual narrative. As for this witness's statements that Shaw "did not walk towards the officer" and that Officer Shaw "just was walking up on him, and then he dropped him" (*id.* at 8, 11), (Continued)

"Williams had no probable cause to believe the decedent was going to attack him with the axe" because Shaw "simply turned around to make a comment" (doc. 21, at 11, 16) fail for precisely the same reasons.  Again, the video evidence unmistakably shows Shaw suddenly screaming and charging at Officer Williams, closing the distance to be within arm's length of him and still holding the hatchet in his right hand despite dozens of police directives to put it down.  Under the circumstances, it was entirely reasonable for Officer Williams to believe that Shaw was going to attack him with the hatchet, and to employ deadly force to protect himself from such an attack.  *See Singletary*, 804 F.3d at 1181 ("[a]s to deadly force, a police officer may use such force to dispel a threat of serious physical harm to either the officer or others"); *Penley*, 605 F.3d at 851 (plaintiffs "do not contest that their son refused to comply with repeated commands to drop his weapon.  Non-compliance of this sort supports the conclusion that use of deadly force was reasonable."); *Garczynski*, 573 F.3d at 1169 ("At least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force.") (citations omitted); *Martinez*, 648 Fed.Appx. at 893-94 ("Plaintiff claims there was no indication he intended to harm King when he advanced toward him, but it was reasonable for King to conclude otherwise.  King was not required to try and divine Plaintiff's subjective intent.").

Fourth, plaintiff's assertion that Officer Williams "provoked the decedent to turn around, by following him unlawfully with a loaded weapon trained at the back of the decedent's head" (doc. 21, at 12) is factually and legally misguided.  As a factual matter, no reasonable observer watching the video could conclude that Officer Williams provoked Shaw to attack him.  Officer Williams was attempting to defuse a tense and rapidly evolving situation by directing an erratic, hostile, armed suspect to relinquish his deadly weapon.  No one will ever know why Shaw refused the officers' instructions and instead lunged toward Officer Williams while still carrying

---

plaintiff cannot rely on them to create a genuine issue of material fact on summary judgment because Jones' testimony in these respects is directly contradicted by the video evidence. Furthermore, in his Response, plaintiff mistakenly attributes certain statements culled from the deposition of Don Jones (who was not a law enforcement officer) to his brother, Detective Jones (who was one of the three Selma police officers involved in the incident).  (Doc. 21, at 5 (bottom paragraph refers repeatedly to Exhibit 5, which is Detective Jones' deposition, when the quotations in question were actually found in Don Jones' deposition, which is Exhibit 4).)

his axe.  But it does not matter.  On this record, no reasonable finder of fact could attribute Shaw's conduct to "provocation" by defendants.  Even if plaintiff could make a factual showing of provocation, this argument would fail to overcome Officer Williams' cloak of qualified immunity because there was no clearly established law declaring it unconstitutional for a police officer to approach a suspect or "provoke" a confrontation.  *See, e.g., Davidson*, 2017 WL 164315, at *3-4 (rejecting argument that "Davidson disputes that there was any rapidly developing, uncertain, and tense situation until Hancock created one," in light of binding authority forbidding courts from using hindsight to assess reasonableness); *Rachel v. City of Mobile, Ala.*, 112 F. Supp.3d 1263, 1281 (S.D. Ala. 2015) (where plaintiff argued that officers "provoked a violent situation" by approaching an emotionally disturbed person, finding nothing in the language of the Fourth Amendment or Supreme Court or Eleventh Circuit decisions that "speak to the constitutionality of the antecedent act of approaching the suspect or 'provoking' a confrontation").  Fifth, plaintiff would rely on other officers' testimony that he says disapproves of Officer Williams' actions or establishes that other officers "knew the decedent wouldn't hurt him."  (Doc. 21, at 12, 15, 16.)[21]  But the Eleventh Circuit has cautioned against evaluating the reasonableness of one officer's use of deadly force from the standpoint of another officer whose perspective on the incident was different.  *See Penley*, 605 F.3d at 852 ("The Penleys' reliance on Sergeant Brubaker's statement that he did not feel threatened is misplaced.  The relevant question is whether a reasonable officer in Lieutenant Weippert's shoes would have believed that Mr. Penley was gravely dangerous.").[22]

---

[21]     As an aside, plaintiff cites page 61 of Detective Jones' deposition for the proposition that Detective Jones "knew the decedent wouldn't hurt him."  (Doc. 21, at 16.)  No such sentiment can be found on the cited page.  Moreover, when plaintiff's counsel asked Detective Jones if he knew that Shaw "really wasn't going to do you no real harm," Detective Jones responded, "Well I can't say he wasn't going to do any harm."  (Doc. 21, Exh. 5, at 59.)  Detective Jones also pointed out that if Officer Williams "felt threatened by him, then he felt threatened."  (*Id.* at 61.)  When asked if Officer Williams could have avoided the killing, Detective Jones answered, "I can't say.  He was threatened."  (*Id.* at 70.)  Nowhere did Detective Jones testify that Officer Williams had no reason to feel threatened by Shaw, much less that Detective Jones knew Shaw would not harm anyone at the moment of the shooting.  Thus, the factual premise of plaintiff's argument is not supported by the summary judgment record.

[22]     To sharpen the point, Shaw did not lunge or charge toward Officer Boone or Detective Jones, much less any of the other lay witnesses on the scene or other Selma police officials who were deposed in this case.  Thus, testimony from those witnesses as to whether (Continued)

The fundamental defect in all of plaintiff's excessive force arguments is that they disregard the Supreme Court's admonition that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Penley*, 605 F.3d at 850 (citing *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Courts "must be careful to evaluate the reasonableness of an officer's conduct on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Penley*, 605 F.3d at 850 (citations and internal quotation marks omitted). "Reconsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred. This is what we mean when we say we refuse to second-guess the officer." *Carr v. Tatangelo*, 338 F.3d 1259, 1270 (11th Cir. 2003) (citation omitted). Simply put, "[o]ur task is not to evaluate what the officers could or should have done in hindsight." *Garczynski*, 573 F.3d at 1167. Viewed from the perspective of a reasonable police officer standing in Officer Williams' shoes, Shaw appeared gravely dangerous at the moment of the shooting. Therefore, Officer Williams did not violate Shaw's Fourth Amendment right to be free from excessive force, and the qualified immunity analysis must come to an end.[23]

---

they felt threatened by Shaw as a general or abstract proposition is unhelpful. Equally importantly, plaintiff's argument overlooks clear, unrebutted testimony that this episode was between Shaw and Officer Williams, not the other two. In this regard, Detective Jones testified as follows about the moments before the shooting: "[A]t that specific time, Mr. Shaw turned. When he made that turn – and listen to me closely because I'm serious. When he made the turn, he became directed in Williams' path. And him and Williams made, it looked like, eye-to-eye contact, like me and Mr. Boone was not even there. We didn't even exist. It was like just him and him. … I'm struck because Mr. Shaw makes a movement toward Williams. He goes directly at Williams." (Jones Dep., at 47.) In light of this chilling testimony and the clarity of the video recording on this point, whether some other officer might or might not have believed Shaw to be gravely dangerous in that moment "sheds little light on whether [Officer Williams'] conduct was objectively reasonable." *Penley*, 605 F.3d at 852.

[23]     Even if the record supported a finding of a constitutional violation, which it does not, Officer Williams would remain entitled to qualified immunity as to plaintiff's excessive force claims. Of course, "even if the defendant official's acts are unconstitutional, he can be held liable only if the law so clearly established the wrongfulness of his conduct that any reasonable official in his place would have understood that he was violating the plaintiff's (Continued)

### B. False Arrest / False Imprisonment.

Counts Three and Four of the Complaint set forth what appear to be § 1983 claims of false arrest and false imprisonment.

#### 1. False Arrest.

As to false arrest, plaintiff asserts that (in addition to the use of deadly force addressed *supra*) defendants violated Shaw's rights to be free from false arrest because "[p]ointing a weapon at a subject is also a seizure under the Fourth Amendment." (Doc. 21, at 16.) Plaintiff elaborates, with no citations to authority, that Shaw "was unlawfully seized the moment Williams trained his weapon on him … when Williams first arrived at the laundromat." (*Id.* at 17.) The threshold defect in this claim is that a § 1983 false arrest claim requires an arrest. *See, e.g., Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010) ("An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a § 1983 claim …."); *Jones v. Brown*, 649 Fed.Appx. 889, 890 (11th Cir. May 16, 2016) ("A claim for false

---

constitutional rights." *Singletary*, 804 F.3d at 1180-81. It is black-letter law that "clearly established law should not be defined at a high level of generality. … As this Court explained decades ago, the clearly established law must be particularized to the facts of the case." *White v. Pauly*, --- U.S. ----, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (citations and internal quotation marks omitted). But plaintiff has identified neither materially similar precedent, nor broad principles of law that are clearly applicable, nor explicit statutory or constitutional statements. At best, he invokes *McKinney v. DeKalb County, Ga.*, 997 F.2d 1440 (11th Cir. 1993); however, *McKinney* is not at all particularized to the facts of this case. The plaintiff in *McKinney* was a teenager who "had previously put down his knife and was merely shifting position, not threatening the safety of any persons, when Officer Nelsen shot him." *Id.* at 1443. By contrast, Shaw was armed with a hatchet that he had refused to put down despite dozens of police commands that he do so, had abruptly wheeled on Officer Williams and charged at him, screaming in an aggressive manner. *McKinney* is in no way "clearly established law" within the meaning of the particularized principles reiterated by the Supreme Court in *White*. Rather than identifying a materially similar case, plaintiff would defeat qualified immunity via the notion that "[t]he officers violated clear department protocol in pursuing the decedent." (Doc. 31, at 14.) But that argument fails as a matter of law; indeed, the Supreme Court has opined that "[e]ven if an officer acts contrary to her training, … that does not itself negate qualified immunity where it would otherwise be warranted." *City and County of San Francisco, Calif. v. Sheehan*, --- U.S. -----, 135 S.Ct. 1765, 1777, 191 L.Ed.2d 856 (2015); *Rachel*, 112 F. Supp.3d at 1282-83 ("There thus can be no doubt that training and policy cannot substitute for appropriate judicial precedent in the 'clearly established' analysis."). In short, Officer Williams would be entitled to summary judgment on the ground of qualified immunity even if plaintiff had shown a constitutional deprivation in his excessive force claims (which he has not).

arrest arises when an arrest occurs without a warrant and without probable cause."). Officer Williams' act of pointing his service firearm at Shaw does not convert an investigatory stop into an arrest, as a matter of settled law. *See, e.g., Clark v. City of Atlanta, Ga.*, 544 Fed.Appx. 848, 854 (11th Cir. Nov. 15, 2013) ("the officers' actions in drawing their guns did not turn the investigatory stop into an arrest").[24] Plaintiff presents no authority to the contrary and fails to distinguish any of these Eleventh Circuit cases. As in those decisions, it was reasonable for the officers here both to initiate contact with Shaw and to draw weapons when Shaw emerged from the abandoned laundromat wielding a hatchet that he refused to set down. In the absence of an arrest, of course, plaintiff's § 1983 false arrest cause of action evaporates.

Notwithstanding the foregoing, the Court will examine the entirety of the officers' interaction with Shaw from a Fourth Amendment standpoint, on the off-chance that plaintiff may be asserting a § 1983 claim predicated on an alleged unconstitutional, non-arrest seizure of Shaw *preceding* the fatal shooting. As an initial matter, plaintiff suggests that the officers violated the Fourth Amendment by merely speaking with Shaw on the day in question. Plaintiff posits that the underlying offense (disorderly conduct) was a misdemeanor, that the officers did not have authority to arrest Shaw, that they should not have gone into the abandoned laundromat to speak with Shaw, and that they should have left him alone as he walked down Griffin Avenue towards Church's Chicken wielding a hatchet. All of these assertions are flatly irreconcilable with well-settled Fourth Amendment principles.

"In *Terry v. Ohio*, the Supreme Court held that an officer does not violate the Fourth Amendment by conducting a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Moore v. Pederson*, 806 F.3d 1036, 1044 (11th Cir. 2015) (citation and internal quotation marks omitted); *see also United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) (*Terry* stops are permissible where "the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal

---

[24]    *See also Jackson v. Sauls*, 206 F.3d 1156, 1166 n.13 (11th Cir. 2000) ("Under this Circuit's law, Defendants' drawing their guns and ordering Plaintiffs to lie down did not convert this investigatory stop or seizure into an arrest."); *United States v. Roper*, 702 F.2d 984, 985 (11th Cir. 1983) ("we hold that a drawn gun by a police officer did not convert an otherwise investigative stop into an arrest"); *United States v. Ochoa*, 402 Fed.Appx. 478, 483 (11th Cir. Nov. 9, 2010) ("the officers acted reasonably in drawing their guns during the initial approach, and their decision to do so did not convert the approach into an arrest").

activity") (citations omitted).  Uncontroverted record evidence reflects the following: (i) the Church's Chicken manager called police to report that Ananias Shaw had attempted to enter his restaurant armed with a hatchet; (ii) a dispatcher called law enforcement to that location for a report of disorderly conduct in progress; and (iii) Detective Jones happened to be in the immediate vicinity when the call was made and observed Shaw in a nearby alleyway "hollering and yelling."  These circumstances gave rise to the requisite reasonable suspicion authorizing the officers to conduct a brief, investigatory stop of Shaw; after all, the totality of the circumstances furnished officers with a particularized basis for suspecting Shaw of having engaged in wrongdoing.  *See Lewis*, 674 F.3d at 1305 ("Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.") (citations omitted).[25]  As such, the officers' initial contact with Shaw in the derelict building and their request that he come out to talk to them in no way infringed on Shaw's Fourth Amendment rights.

Of course, the Fourth Amendment requires not only that a *Terry* stop be justified in its inception, but also that the stop be "lawful in its scope and duration."  *Croom v. Balkwill*, 645 F.3d 1240, 1248 (11th Cir. 2011).  Plaintiff theorizes that, once Shaw emerged from the laundromat, the officers should have simply disengaged and allowed him to go about his business.  In plaintiff's view, then, the officers should have returned to their patrol cars and driven away from the scene, leaving Shaw, agitated and hostile, and walking down the street in the direction of Church's Chicken (from which he had been involuntarily denied entry just minutes earlier) with a deadly weapon in his hand.  The Fourth Amendment did not require the officers to select such a reckless and irresponsible course of action.  *See, e.g., Lewis*, 674 F.3d at 1309 ("the very rationale underpinning *Terry* – the protection of officer safety and the safety of

---

[25]      In addition to comporting with *Terry* principles, the officers' actions in this regard were fully consistent with, and expressly authorized by, Alabama law.  *See* Ala. Code § 15-5-30 (police officer "may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony ***or other public offense*** and may demand of him his name, address and an explanation of his actions") (emphasis added); *Schultz v. State*, 437 So.2d 670, 673 (Ala.Crim.App. 1983) ("There can be no serious question that a misdemeanor such as a game and fish law violation is a 'public offense' within the meaning of Section 15-5-30. … [M]isdemeanors have routinely been classified as 'public offenses' in Alabama and other jurisdictions.").

others nearby … is presented by the facts of this case"); *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989) ("police may take reasonable action, based upon the circumstances, to protect themselves during investigative detentions"); *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (11th Cir. 1985) ("Police may take reasonable action, based upon the circumstances, to protect themselves during these encounters, or to maintain the status quo.").  It was manifestly reasonable under the circumstances for the officers to accompany Shaw has he walked down the street, to direct him to put down the hatchet, and to have their batons or service firearms drawn in order to protect themselves.

In short, nothing about the officers' conduct in the approximately two-minute interval spanning from Officer Boone's entrance into the abandoned laundromat until the moment when Shaw turned around and charged at Officer Williams constituted an unreasonable seizure under the Fourth Amendment that might support officer liability under § 1983.[26]

### 2.      *False Imprisonment.*

Plaintiff also asserts a false imprisonment claim under § 1983 "based on the protection of the Fourteenth Amendment against deprivations of liberty without due process of law."  (Doc. 21, at 16.)  The Eleventh Circuit recently set forth the elements of a § 1983 false imprisonment claim as follows:

> "A § 1983 claim of false imprisonment requires a showing of common law imprisonment and a due process violation under the Fourteenth Amendment.  …

---

[26]      As a separate legal ground for reaching this same conclusion, the Court observes binding authority holding that no Fourth Amendment seizure occurs at all prior to a police shooting in analogous factual situations.  In *Menuel v. City of Atlanta*, 25 F.3d 990 (11th Cir. 1994), police officers surrounded a house in which the decedent was confined.  Ultimately, the officers entered the home, a gunfight ensued, and the decedent was shot and killed.  The plaintiff claimed that the officers' conduct prior to the shooting amounted to an unlawful Fourth Amendment seizure.  The Eleventh Circuit disagreed, holding that "[b]ecause the decedent was intransigent and because she neither yielded to physical force (none was applied to her before the fatal shooting) nor submitted to a display of authority (much of which was applied before the shooting), … no seizure, reasonable or unreasonable, occurred before the shooting."  *Id.* at 995.  The same is true here.  Shaw was intransigent.  He neither yielded to the officers' commands (*i.e.*, by dropping his weapon and surrendering to police) nor was physically touched by the police until he was shot.  As such, in a straightforward application of *Menuel*, Shaw was not seized within the meaning of the Fourth Amendment until the moment of the shooting; therefore, his estate cannot assert § 1983 claims for alleged Fourth Amendment violations preceding the shooting because no seizure (reasonable or otherwise) took place.

> The elements of common law false imprisonment are an intent to confine, an act resulting in confinement, and the victim's awareness of confinement. … A plaintiff must also prove that the defendant acted with deliberate indifference in violating the plaintiff's right to be free from continued detention after the defendant knew or should have known that the detainee was entitled to release."

*May v. City of Nahunta, Georgia*, 846 F.3d 1320, 1329 (11th Cir. 2017) (citations and internal quotation marks omitted).  Under the common law, false imprisonment requires "some direct restraint of the person … by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go."  *Perkins v. City of Creola*, 713 F. Supp.2d 1326, 1345 (S.D. Ala. 2010) (citation omitted).

The most fundamental problem with plaintiff's false imprisonment claim is that there was no confinement in this case.  To be sure, Officer Williams drew his firearm, pointed it at Shaw, and issued certain commands to him.  But none of those directives operated as a "direct restraint" on Shaw, compelled him to remain in a specific place or to go to a specific place, or otherwise operated to confine his movement in any form or fashion.  The officers never commanded Shaw to stop moving or to go someplace else, but instead simply instructed him to disarm himself.  Indeed, the proof is in the pudding.  Shaw continued walking down the street as he pleased, without regard to what the officers were telling him.  His freedom of movement was untrammelled by anything the officers said or did.  Given these circumstances, there was nothing that could rationally be deemed a "confinement" or a "direct restraint;" therefore, plaintiff's false imprisonment claim fails as a matter of law.[27]

### C.    *"Policy or Custom" Liability for the City of Selma.*

In Counts 5 through 9 of the Complaint, plaintiff appears to assert various claims of § 1983 municipal liability against defendant City of Selma, grounded in theories of a policy of inadequate training and supervision, a custom of police abuse, a custom of deliberate indifference in hiring, and deliberate indifference to repeated complaints.  With respect to all of

---

[27]    Even if the summary judgment record supported a reasonable inference of confinement (which it does not), there is absolutely no evidence that Officer Williams or any other defendant acted with deliberate indifference in continuing to confine/restrain Shaw "after it was or should have been known that [he] was entitled to release."  *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009).  In other words, even if plaintiff were able to satisfy the elements of common-law false imprisonment, his § 1983 claim would nonetheless fail for want of proof of a Fourteenth Amendment due process violation.

these causes of action, plaintiff includes only a grand total of one paragraph in his summary judgment brief, wherein he (i) acknowledges his obligation "to identify a policy or custom of the police department that contributed to his injury," and (ii) states that the Selma Police Department "never had consistent training in dealing with mentally ill," and (iii) indicates that Officer Williams "had only an 8 hour workshop on dealing with the mentally ill." (Doc. 21, at 17.)

The defects in plaintiff's § 1983 municipal liability claims are glaring. As an initial matter, the Court has already found that Officer Williams and his colleagues did not violate Shaw's Fourth Amendment or Due Process rights in connection with their investigatory stop, their acts of following him down the street with weapons drawn and telling him to put down the hatchet, or the fatal shooting itself. There being no constitutional violation by the individual officers, the City of Selma can have no § 1983 municipal liability based on its policies and training, as a matter of law. *See, e.g., Penley*, 605 F.3d at 855 ("Because we hold that Lieutenant Weippert did not deprive Mr. Penley of a constitutional right, it is unnecessary for us to evaluate the constitutionality of Sheriff Eslinger's use of force policy."); *Garczynski*, 573 F.3d at 1171 ("Absent a constitutional violation, we need not explore whether PBSO's policies regarding crisis intervention training violated Garczynski's constitutional rights."); *Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009) ("absent a violation of Case's constitutional rights by Officer Davis, both Sheriff Eslinger and the City … are entitled to summary judgment"); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("Since we have determined that Deputy Watson's conduct did not cause the Rooneys to suffer a constitutional deprivation, we need not inquire into Volusia County's policy and custom relating to patrol vehicle operation and training."); *Windham v. City of Fairhope*, 597 Fed.Appx. 1068, 1073 (11th Cir. Jan. 29, 2015) ("because we conclude the officers had actual probable cause to arrest Ms. Windham for disorderly conduct in obstructing vehicular traffic, there is no constitutional violation for which the City could be held responsible").

Even if plaintiff had shown a constitutional deprivation by Officer Williams, § 1983 liability could not attach to the City under these circumstances. The parties agree that the plaintiff must "identify a municipal policy or custom that caused his injury." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citations and internal marks omitted). On summary judgment, the lone municipal policy identified by plaintiff is an alleged lack of "training on dealing with the mentally ill." (Doc. 21, at 17.) But the evidence does not support a

reasonable inference that the City of Selma's training was deficient in this regard.  While plaintiff contends that "SPD never had consistent training" in this area, her lone record citation has no bearing on that allegation.[28]  Plaintiff's assertion that "Williams had only an 8 hour workshop on dealing with the mentally ill" (doc. 21, at 17) appears factually supported; however, plaintiff does not indicate how that training was deficient or why Officer Williams required more than eight hours of training on the subject of mentally ill suspects, particularly when the record establishes that Officer Williams had received extensive, ongoing training in law enforcement practices and procedures.  (Doc. 13, Exh. 11.)  Nor does plaintiff point to any evidence that further training in dealing with mentally ill suspects would have made any difference in this case.[29]  What does plaintiff contend Officer Williams should or would have known if he had received additional training that might possibly have mattered in this case? We can only guess.

Even if plaintiff could overcome all of these problems, his § 1983 failure-to-train claims against the City of Selma would nonetheless fail as a matter of law.  It is well-settled that "under § 1983, a supervisor can be held liable for failing to train his or her employees only where the

---

[28]      Specifically, plaintiff cites "Exhibit 3, p. 49, ll. 4-11" to support the proposition that the Selma Police Department offered inadequate training in this area.  (Doc. 21, at 17.)  The cited excerpt has nothing to do with training in dealing with mentally ill suspects, but rather involves an admission by Officer King that under department policy, an arrest warrant would be needed if a subject "just came in with weapon … but they didn't threaten to use the weapon."  (Doc. 21-3, at 49.)  Of course, the Court is under no independent obligation to rummage through the hundreds of pages of exhibits submitted by plaintiff in search of some excerpt that might bolster his position on this point.  *See, e.g.,* Rule 56(c)(3), Fed.R.Civ.P. (on summary judgment, "[t]he court need consider only the cited materials"); *Longmire v. City of Mobile, Alabama*, 2016 WL 6403327, *1 n.1 (S.D. Ala. Oct. 26, 2016) ("Courts have frowned on the all-too-prevalent litigation practice of stuffing a record with exhibits and leaving it to the court to sift through an undifferentiated mass of uncited materials in search of facts that might help one side or the other.").

[29]      Officer Williams' testimony is clear that, at the time of this incident, he "didn't know" that Shaw was "emotionally imbalanced," to use plaintiff's counsel's term.  (Williams Dep., at 46.)  As Officer Williams put it, "I just knew that he was very disorderly and incoherent."  (*Id.*)  Plaintiff identifies no deficiencies or shortcomings of any kind in the training provided by City of Selma Police Department in dealing with "very disorderly and incoherent" suspects such as Shaw.  Recall that Officer Williams was in Shaw's presence for barely two minutes in total, during which time Shaw was wielding a hatchet and cursing at him.  That allowed precious little opportunity for Officer Williams to attempt to make the mental health diagnosis that plaintiff says he should have completed in that interval.

failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." *Keith v. DeKalb County, Georgia*, 749 F.3d 1034, 1052 (11th Cir. 2014) (citations and internal quotation marks omitted). "But a pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1328 (11th Cir. 2015) (citation and internal marks omitted). The record is devoid of evidence of a pattern of similar constitutional violations by Selma Police Department officers in their dealings with mentally ill suspects.[30]

For all of these reasons, summary judgment is properly entered in favor of the City of Selma as to all claims seeking § 1983 municipal liability.[31]

### D.    State-Law Claims.

What remains of the Complaint is a grab-bag of state-law claims. The only such causes of action that plaintiff identifies in his summary judgment Response as being actively pursued at

---

[30]    "Our analysis is not altered by the fact that evidence of previous incidents is not required to establish city policy if the need to train and supervise in a particular area is 'so obvious' that liability attaches for a single incident." *Weiland*, 792 F.3d at 1329. The record lacks any evidence supporting an inference that the need for further specialized training (above and beyond that already provided) by the Selma Police Department in dealing with mentally ill citizens was "so obvious" that the failure to provide such additional training in that area amounts to deliberate indifference that might support a § 1983 claim against the City of Selma. In the absence of such evidence, plaintiff must establish deliberate indifference via a pattern of similar violations. This he has not done.

[31]    To the extent that plaintiff is endeavoring to assert federal claims against Chief Riley, they fail for the same reasons. After all, "[s]upervisory liability under section 1983 may be shown by either the supervisor's personal participation in the acts that comprise the constitutional violation or the existence of a causal connection linking the supervisor's actions with the violation." *Smith v. LePage*, 834 F.3d 1285, 1298 (11th Cir. 2016) (citation omitted). Chief Riley was not present at the time of the shooting; therefore, only the latter mechanism is in play here. "A causal connection can be established when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (citation and internal quotation marks omitted). As discussed *supra*, the facts in the summary judgment record viewed in the light most favorable to plaintiff do not support an inference that Chief Riley either directed Officer Williams and his colleagues to act unlawfully or knew they would act unlawfully and failed to stop them. Therefore, summary judgment is warranted as to any § 1983 supervisory-liability claims that plaintiff would assert against Chief Riley.

this time are "state law claims of assault and battery, false arrest, false imprisonment, invasion of privacy, intentional inflection of emotional distress, and civil conspiracy." (Doc. 21, at 17.) The Court will therefore focus its attention on those enumerated claims as the state-law causes of action that remain in play.[32]

### 1. Claims against Officer Williams.

In Count 11, plaintiff asserts a cause of action against Officer Williams for assault and battery, stating that he was "careless and unskillful in shooting the Decedent." (Complaint, ¶ 56.) Under Alabama law, a police officer may use a reasonable amount of force and may be held liable only if he or she uses more force than is necessary. *See Walker v. City of Huntsville*, 62 So.3d 474, 494 (Ala. 2010) ("a police officer may use reasonable force and may be held liable only if more force is used than is necessary to effectuate the arrest") (citation omitted). "The

---

[32]  To be sure, in his scattershot Complaint, plaintiff also alleged state-law claims against the City of Selma for negligent hiring, training, and supervision, and for violation of the Alabama Constitution; as well as state-law claims against Officer Williams for wrongful death, negligence and wantonness. Even if plaintiff has not abandoned those claims (and it appears he has), defendants have moved for summary judgment on all of those claims, and summary judgment is properly entered in defendants' favor as to each of them for the reasons argued by defendants. Under Alabama law, a critical element of a claim of negligent hiring, training and supervision is "proof of the employer's actual or constructive awareness of the employee's incompetency." *James v. Nationstar Mortg., LLC*, 92 F. Supp.3d 1190, 1201 (S.D. Ala. 2015) (citation omitted). There is not a scintilla of evidence in the record that, as of December 4, 2013, the City of Selma had actual or constructive awareness of any incompetency in Officer Williams, Officer Boone or Detective Jones relating to their interactions with hostile, incoherent and potentially mentally ill suspects. Even if there were evidence of such awareness, defendants' unrebutted authority shows that both Chief Riley and the City of Selma are insulated by state-agent immunity from any such claim under Alabama law. *See Howard v. City of Demopolis, Ala.*, 984 F. Supp.2d 1245, 1260 (S.D. Ala. 2013) ("because the Police Chief was a peace officer, state-agent immunity protects him and the city from suit based on negligence in his discretionary acts in hiring, training and supervising the police officer") (citation and internal quotation marks omitted). As for plaintiff's Alabama Constitution claim, plaintiff frames the claim as being that the City of Selma "intentionally targets African-Americans for inquiries, investigations, and arrests." (Complaint, ¶ 96.) Once again, the record is completely devoid of evidence to support such an allegation. Even if it were not, defendants have cited uncontroverted caselaw for the proposition that no private right of action for money damages exists for any such violation of the Alabama Constitution. *See, e.g., Tomberlin v. Clark*, 1 F. Supp.3d 1213, 1234 (N.D. Ala. 2014) ("the Alabama constitution does not create a private right of action to sue for monetary damages"). As for the wrongful death, negligence and wantonness claims asserted against Officer Williams, that defendant has properly invoked immunity from those claims, as discussed further *infra*.

evaluation of whether an assault and battery took place in regards to an arrest mirrors whether excessive force was used in a federal claim." *Rogers v. City of Selma*, 178 F. Supp.3d 1222, 1247 (S.D. Ala. 2016). Both parties concur in their summary judgment briefs that the assault and battery claim stands or falls using precisely the same analysis as plaintiff's Fourth Amendment excessive force claim. The Court has already determined, *supra*, that Officer Williams' use of deadly force against Shaw was reasonable under the totality of the circumstances for Fourth Amendment purposes. That reasonableness determination conclusively defeats plaintiff's state-law assault and battery claim.

In Counts 12 and 13, plaintiff brings state-law causes of action for false arrest and false imprisonment. Under Alabama law, a claim for false arrest requires an arrest. *See, e.g., Ex parte Harris*, --- So.3d ----, 2016 WL 4204837, *9 (Ala. July 29, 2016) ("A false arrest requires proof that the defendant caused [him] to be arrested without probable cause.") (citations and internal quotation marks omitted). As the Court has already found that Shaw was not arrested, plaintiff's state-law false arrest claim fails as a matter of law. Likewise, a claim under Alabama law for false imprisonment requires "some direct restraint of the person … by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he was not wish to go." *Sanders v. Shoe Show, Inc.*, 778 So.2d 820, 823 (Ala.Civ.App. 2000) (citation omitted). Plaintiff insists that "Officer Williams imprisoned the decedent by putting him at gunpoint." (Doc. 21, at 18.) The video clearly demonstrates, however, that even after Officer Williams drew his firearm, Shaw was in no way restrained. He walked where he wanted, when he wanted. He did not remain in one place at Officer Williams' command, nor did he go someplace in compliance with Officer Williams' command. Officer Williams did not direct Shaw to stand still or to go to any specific place while his weapon was drawn and pointed at him. To the contrary, the video establishes that Shaw was not directly restrained in any way by Officer Williams pointing a gun at him. For that reason, plaintiff's false imprisonment claim is not cognizable under Alabama law.

In Count 15 of the Complaint, plaintiff purports to bring a state-law invasion of privacy claim, on the ground that "[t]he Defendant Officers intentionally intruded upon the solitude or seclusion of the Decedent by invading his emotional sanctum." (Complaint, ¶ 77.) Alabama law requires that a claim for invasion of privacy predicated on a wrongful intrusion requires a showing that "the thing into which there is intrusion or prying is entitled to be private," after

which "the court will consider two primary factors in determining whether an intrusion is actionable: (1) the means used, and (2) the defendant's purpose for obtaining the information." *Martin v. Patterson*, 975 So.2d 984, 994 (Ala.Civ.App. 2007); *see also Johnson v. Corporate Special Services, Inc.*, 602 So.2d 385, 388 (Ala. 1992) (once the court "finds that the purpose of the investigation was legitimate … the only issue remaining is whether the means used was offensive or objectionable"). It is far from clear in this case that the officers intruded or pried into anything relating to Shaw that was entitled to be private. Even if they had, as discussed at great length *supra*, the officers were plainly empowered under applicable law to approach Shaw for the purpose of investigating the disorderly-conduct call. When Shaw immediately picked up a hatchet and started walking down the street while cursing the officers and otherwise behaving erratically, it was likewise both lawful and reasonable for the officers to follow him and endeavor to disarm him before he hurt himself or members of the public. In short, the Court finds no genuine issue of material fact that (i) the purpose of the officers' investigation of Shaw was entirely legitimate, and (ii) the means they used to conduct that investigation were neither offensive nor objectionable. Any intrusion that the officers may have made into Shaw's emotional sanctum (and the Court is not at all convinced that there was such an intrusion) was not wrongful and, therefore, is not actionable under Alabama law.

Count 21 of the Complaint purports to assert a cause of action for the Alabama tort of outrage, or intentional infliction of emotional distress. To prevail on this claim, plaintiff must prove the following: "(1) that the Defendant either intended to inflict emotional distress, or knew or should [have] known that emotional distress was likely to result from his conduct; (2) that the Defendant's conduct was extreme and outrageous[;] and (3) that the Defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Hamilton v. City of Jackson*, 508 F. Supp.2d 1045, 1060 (S.D. Ala. 2007) (citation omitted). "The tort of outrage is an extremely limited cause of action" and requires conduct "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Ex parte Bole*, 103 So.3d 40, 53 (Ala. 2012) (citations and internal quotation marks omitted). On this record, no reasonable finder of fact could conclude that the conduct of Officer Williams and his colleagues (*i.e.*, attempting to speak with Shaw about the disorderly conduct complaint from Church's Chicken, directing Shaw on dozens of occasions to put down the hatchet, walking alongside an armed and belligerent

subject with weapons drawn in a public area with civilians present, and using lethal force when Shaw abruptly turned and charged Officer Williams) was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society.[33]  Officer Williams was forced to make split-second decisions in a dangerous and rapidly evolving situation with an erratic, hostile, armed suspect, to protect the safety of the public and himself.  The actions he took in those circumstances were lawful, reasonable, and cannot rationally be deemed extreme and outrageous as those terms are defined by Alabama authorities.  Plaintiff's outrage claim fails as a matter of law.

In Count 14 of the Complaint, plaintiff purports to assert a claim of civil conspiracy against all defendants, theorizing that they "failed and refused to provide Plaintiffs [*sic*] with any facts, reports, information, videos, etc in an attempt to avoid litigation" and "failed to conduct an adequate investigation."  (Complaint, ¶ 68.)  Plaintiff further alleges that "[a]s a proximate result of the defendants' acts and omissions, Decedent was caused to suffer injuries resulting in death." (*Id.*, ¶ 69.)  As an initial matter, this claim is pleaded in a nonsensical manner because defendants' post-shooting conduct could not have proximately caused Shaw's injuries resulting in death.  Moreover, any civil conspiracy claim predicated on allegations that these defendants (City of Selma, Chief Riley, Officer Williams) failed to conduct an adequate investigation suffers from an insuperable logical defect because the record unequivocally shows that the Alabama Bureau of Investigation ("ABI") assumed responsibility for investigating the Shaw shooting from the outset, at Chief Riley and the City of Selma's express request.[34]  Finally,

---

[33]    Courts applying Alabama law have displayed unwillingness to extend the scope of the tort of outrage to encompass the use of force by law enforcement officers, even when the officers' use of force was not justified and was otherwise egregious.  *See, e.g., Sheth v. Webster*, 145 F.3d 1231, 1234-35 (11th Cir. 1998) (affirming summary judgment dismissing outrage claim where plaintiff posed no threat, but officer kneed her in the stomach, pushed her against a soda machine, handcuffed her, and dragged her to a police car); *Scott v. Palmer*, --- F. Supp.3d ----, 2016 WL 5390589, *11 (N.D. Ala. Sept. 27, 2016) (granting summary judgment on outrage claim where officer arrived at church just after service ended, plaintiff was church deacon who was non-threatening, and officer handcuffed him, kicked his legs out from under him, pinned him face down on the ground, struck him in the back with his knees, pressed his face into the dirt, and threatened to tase him, all in front of plaintiff's grandchildren, friends and church congregants).

[34]    Indeed, the first sentence of the ABI's summary report of its investigation reads as follows:  "This investigation was ordered by the Alabama Bureau of Investigation Chief, Major (Continued)

plaintiff's claim that defendants conspired to withhold investigative information from him misapprehends the mechanics of a civil conspiracy claim.  Under Alabama law, "liability for civil conspiracy rests upon the existence of an underlying wrong and if the underlying wrong provides no cause of action, then neither does the conspiracy."  *Freeman v. Holyfield*, 179 So.3d 101, 106 (Ala. 2015).  In this case, plaintiff contends that defendants wronged him by not providing him information and investigative materials regarding the Shaw shooting.  But he identifies no statute, regulation, case, legal principle or other authority that entitled him to receive full, unfettered, immediate access to investigative materials upon request.  Simply put, plaintiff has made no showing or colorable argument that the temporary withholding of such information and materials was unlawful or wrongful.  There being no actionable underlying wrong, any activity by defendants in conspiring to withhold that information from plaintiff cannot be actionable as a civil conspiracy under Alabama law.  Defendants are entitled to summary judgment on this claim.

### 2.       *State-Agent Immunity for Officer Williams.*

For any state-law claims not addressed on the merits *supra* (such as the wrongful death, negligence and wantonness claims), and for any state-law claims asserted against Officer Williams that may be otherwise cognizable and supported by evidence in the record, entry of summary judgment in Officer Williams' favor remains appropriate pursuant to the doctrine of state-agent immunity.

An Alabama statute provides that "[e]very peace officer … shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."  Ala. Code § 6-5-338(a).  Acts performed within an officer's discretionary functions are those "as to which there is no hard and fast rule as

---

NEIL TEW, upon a written request from WILLIAM RILEY, Selma Police Chief on 12/16/2013."  (Doc. 13, Exh, 1, at 2.)  Plaintiff cannot rationally fault defendants for an investigation performed exclusively by the Alabama Bureau of Investigation, which is not and has never been a party to this litigation.  In his summary judgment brief, plaintiff objects that "[t]he ABI … conducted only a 30 minute interview of Williams" and "failed to inquire into whether Williams followed his training and department policy."  (Doc. 21, at 18.)  Plaintiff identifies no facts or law under which the named defendants in this case could be responsible for alleged defects in an investigation performed solely by an independent, non-party entity.

to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Sheth v. Webster*, 145 F.3d 1231, 1239 (11th Cir. 1998) (internal quotation marks omitted). "A defendant initially bears the burden of demonstrating that he was acting in a function that would entitle the agent to immunity." *Brown*, 608 F.3d at 741. It cannot be seriously disputed that Officer Williams was performing a discretionary function in the line and scope of his law enforcement duties at all times in his dealings with Shaw on the date in question. He was dispatched on a disorderly conduct call. He attempted to investigate the call by approaching Shaw. And he attempted to protect himself, his fellow officers and the public in a rapidly-evolving, tense and dangerous situation after Shaw emerged from the laundromat with a hatchet, shouted and cursed at the officers, and refused to put down his deadly weapon as he walked back in the direction of Church's Chicken. Officer Williams was plainly performing discretionary functions. *See, e.g., Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1268 (11th Cir. 2010) ("Police investigations and arrests usually are considered discretionary functions within the line and scope of law enforcement duties for the purposes of discretionary-function immunity.") (citations and internal marks omitted); *Swan v. City of Hueytown*, 920 So.2d 1075, 1079 (Ala. 2005) ("In choosing which information to relay to the dispatcher … and, in later deciding to arrest Swan upon confirmation a warrant was outstanding, Officer Williams was 'exercising judgment in the enforcement of criminal laws' within the meaning of *Cranman*.").

Because Officer Williams was performing discretionary acts, he is entitled to state-agent immunity unless plaintiff shows "sufficient 'bad intent' – willfulness, malice, fraud, bad faith, actions beyond authority, or actions taken under a mistaken interpretation of law." *Grider*, 618 F.3d at 1268; *see also Ex parte Mason*, 146 So.3d 9, 12 (Ala. 2013) (if state agent shows that claims arise from a function entitling state agent to immunity, "the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority"). Plaintiff posits that Officer Williams' immunity is erased by "his failure to discharge his duties pursuant to detailed rules and regulations, his acting beyond his authority in pursuing a misdemeanor suspect, and his acting willfully, maliciously and in bad faith in shooting the decedent." (Doc. 21, at 20.) None of these assertions can withstand scrutiny.

-33-

Without question, "[a] State agent acts beyond authority and is therefore not immune when he or she fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Mason*, 146 So.3d at 12-13 (citations and internal marks omitted). The critical distinction is whether those rules or regulations "*must* be followed by an officer" or whether they are simply guidelines (in which case immunity remains intact). *Ex parte Brown*, 182 So.3d 495, 506 (Ala. 2015). The uncontroverted record evidence shows no failure by Officer Williams to abide by detailed rules or regulations. As a matter of the Selma Police Department's written policy, Officer Williams was authorized to use deadly force "in order to … protect the officer or others from what is reasonably believed to be an immediate threat of death or serious bodily harm." (Doc. 13, Exh. 3, § 3.11.19(1)(a).) As analyzed in great detail *supra*, at the moment he fired his weapon, Officer Williams reasonably believed it was necessary to do so to protect himself from an immediate threat of death or serious bodily harm (*i.e.*, Shaw coming after him at close range armed with a hatchet). Thus, his conduct was fully compliant with departmental policy. Any suggestion that Officer Williams violated "detailed rules or regulations, such as those stated on a checklist" in his use of deadly force is devoid of evidentiary support.[35]

---

[35] The bulk of plaintiff's argument on this point relates to Officer Williams' conduct before the shooting took place. As an initial matter, plaintiff identifies the incorrect time period for purposes of the immunity analysis. Plaintiff is not suing Officer Williams under Alabama law for answering a dispatch call, appearing at the laundromat or walking down the street with Shaw. He is suing Officer Williams under Alabama law for firing the shot that killed Shaw. None of the events preceding that shooting proximately caused Shaw's death, or are otherwise germane to any state-law claims that have not abated with Shaw's death. The immunity analysis must therefore be focused on that conduct, not what happened before. Even if plaintiff could properly expand the temporal frame of the immunity analysis to look backwards in this manner, immunity would remain appropriate. Plaintiff asserts that Officer Williams violated department policy by (i) pursuing Shaw at all because he had no authority to question him about a misdemeanor, (ii) getting too close to Shaw and putting himself in harm's way, and (iii) pointing a gun at Shaw instead of "getting him comfortable" or calling the hospital because Shaw was mentally ill. (Doc. 21, at 20-21.) As to none of these purported policy violations can plaintiff identify "detailed rules or regulations, such as those stated in a checklist." Viewed in context, the testimony of Selma Police Captain Johnny King (on which plaintiff relies heavily) reveals no hard-and-fast rules barring officers from questioning disorderly conduct suspects unless they witnessed the offense themselves. To the contrary, Captain King testified that there were circumstances when officers could in fact contact a suspect. (King Dep. (doc. 21, Exh. 3), at 38-44.) For example, Captain King testified that if a complainant called the police to complain that (Continued)

As for malice, plaintiff trumpets Officer Williams' actions during the shooting as "the epitome of malice." (Doc. 21, at 21.) Plaintiff says that Officer Williams told Shaw to put down the hatchet, then "walked up on him and then dropped him. … Death for disobedience." (*Id.*) According to plaintiff, "It seems that Williams was just intent on using his weapon." (*Id.* at 15.) Such a fictional narrative can only be credited if we ignore the events clearly depicted on the video and the testimony of every single witness deposed in this case, including Don Jones (as to whom plaintiff's narrative relies on selected bits and pieces to the exclusion of other testimony by that very witness that Shaw was raising the hatchet as if to throw it when the shooting took place). The operative legal standard for summary judgment does not permit courts to disregard clear video recordings, to ignore sworn deposition accounts, or to indulge a non-movant's wishful thinking and unsupported inflammatory rhetoric about a bloodthirsty policeman. There is not a scintilla of evidence in the summary judgment record that Officer Williams acted willfully, maliciously or in bad faith when he fired the fatal shot at Shaw, who at that very

---

a suspect had been cursing at the employees and had just left, and if the police arriving on the scene see the suspect a couple of blocks down the road, the officers may make contact with and detain him. (*Id.* at 44.) That is precisely what the officers did in this case. As for "getting too close," plaintiff identifies no rules or policies forbidding Selma police officers from physical proximity to suspects, only that Captain King "probably wouldn't have" gotten as close to Shaw as Officer Williams did. (*Id.* at 68.) As for "putting oneself in harm's way," plaintiff points to no absolute prohibition against Selma Police Department officers putting themselves in harm's way; to the contrary, putting oneself in harm's way appears to be part and parcel of the job description of every law enforcement officer in the country. Plaintiff's theory that Officer Williams "brought on" the need to use deadly force has no reasonable basis in the facts as evidenced by the video. Again, Officer Williams and his colleagues were dealing with an armed, hostile and erratic suspect. They were making split-second decisions on how best to defuse the subject and keep themselves, the public and Shaw safe. There was no departmental "checklist" telling them how to achieve those goals in the volatile and dangerous set of circumstances presented here; rather, it was a textbook example of a scenario requiring the officers to utilize discretion. "This exercise of discretion is protected under the doctrine of State-agent immunity." *Ex parte City of Midfield*, 161 So.3d 1158, 1165 (Ala. 2014). Nor was there any detailed rule or regulation requiring Officer Williams to holster his weapon, call a hospital, and speak in soothing tones to a hostile, non-compliant, hatchet-wielding suspect simply because plaintiff believes Officer Williams could or should have diagnosed Shaw as suffering from mental illness sometime in the two-minute period between when Shaw came out of the building cursing and carrying a hatchet and when Shaw moved aggressively against Officer Williams.

moment was rushing Officer Williams while armed with a hatchet and screaming "shoot it! shoot it!" after refusing to comply with dozens of commands to put his weapon down.

In sum, the Court concludes that state-agent immunity protects Officer Williams from liability for all state-law claims and causes of action asserted herein. *See Davidson v. City of Opelika*, --- Fed.Appx. ----, 2017 WL 164315, *4 (11th Cir. Jan. 17, 2017) (affirming summary judgment on Alabama-law assault and battery claim in police shooting case where "video evidence demonstrates that Hancock's actions were neither gratuitous nor in violation of Davidson's clearly established constitutional rights," such that the officer was entitled to state-agent immunity under Alabama law).

### 3.	*Respondeat Superior Liability against the City.*

Finally, plaintiff seeks to hold the City of Selma "liable for the negligent, careless, or unskillful acts of its agent officers" under Alabama law. (Doc. 21, at 21.) By statute, Alabama municipalities may be held liable on a theory of *respondeat superior* for any "injury or wrong … done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty." Ala. Code § 11-47-190. The most immediate defect with this line of reasoning is that the Court has already concluded that Officer Williams is entitled to state-agent immunity pursuant to Alabama Code § 6-5-338(a) for the wrongs that plaintiff contends were the product of Officer Williams' neglect, carelessness or unskillfulness. Because Officer Williams is immune, the City of Selma is likewise immune. *See, e.g., Harris*, 2016 WL 4204837, at *12 ("to the extent that we have concluded above that Harris was entitled to State-agent immunity, the Town would also be immune from suit"); *Ex parte Dixon*, 55 So.3d 1171, 1179 (Ala. 2010) ("It is well established that, if a municipal peace officer is immune pursuant to § 6-5-338(a), then, pursuant to § 6-5-338(b), the city by which he is employed is also immune.") (citations omitted); Ala. Code § 6-5-338(b) ("This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers."). The City of Selma enjoys immunity from plaintiff's state-law claims asserted against it on a theory of *respondeat superior* for the purported neglect, carelessness or unskillfulness of Officer Williams.

### VI.	Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.      Defendants' Motion to Strike Affidavit of Faya Rose Toure (doc. 23) is **granted**, and that Affidavit (which is found at Exhibit 7 to docket entry 21) is **stricken**;

2.      Defendants' Motion for Summary Judgment (doc. 13) is **granted**;

3.      There being no genuine issues of material fact as to any claim or cause of action asserted herein, plaintiff's claims against all defendants are **dismissed with prejudice**; and

4.      A separate Judgment will enter.


DONE and ORDERED this 15th day of March, 2017.


                               s/ WILLIAM H. STEELE
                               UNITED STATES DISTRICT JUDGE